1  JONATHAN M. GORDON (SBN 082202)
   jonathan.gordon@alston.com
2  LEIB M. LERNER (SBN 227323)
   leib.lerner@alston.com
3  CASSANDRA HOOKS (SBN 244471)
   cassandra.hooks@alston.com
4  **ALSTON & BIRD LLP**
   333 South Hope Street, Sixteenth Floor
5  Los Angeles, California 90071
   Telephone:  (213) 576-1000
6  Facsimile:  (213) 576-1100

7  PETER ELIASBERG (SBN 189110)          DANIEL MACH (DC Bar No. 461652)
   peliasberg@ACLU-SC.ORG                dmach@dcaclu.org
8  **ACLU FOUNDATION**                   **ACLU FOUNDATION**
   **OF SOUTHERN CALIFORNIA**            **PROGRAM    ON    FREEDOM    OF**
9  1313 West Eighth Street               **RELIGION AND BELIEF**
   Los Angeles, California 90017         915 15th Street NW
10 Telephone:  (213) 977-9500            Washington, DC  20005
   Facsimile:  (213) 977-5299            Telephone:  (202) 675-2330
11                                       Facsimile:  (202) 546-0738
                                         *Pro hac vice application pending*
12
13 HARSIMRAN KAUR DANG, ESQ. (SBN: 264240)
   harsimran@sikhcoalition.org
14 **THE SIKH COALITION**
   39465 Paseo Padre Pkwy., Ste. 3550
15 Fremont, California 94538
   Telephone: (510) 659-0900 x92
16 Facsimile: (510) 952-3900

17 Attorneys for Plaintiff Sukhjinder S. Basra

18                    **UNITED STATES DISTRICT COURT**

19                    **CENTRAL DISTRICT OF CALIFORNIA**

20                           **WESTERN DIVISION**

21 SUKHJINDER S. BASRA,                   Case No.: CV11-01676 SVW(FMOx)

22                 Plaintiff,             **MEMORANDUM OF POINTS AND**
                                          **AUTHORITIES IN SUPPORT OF**
23          v.                            **PLAINTIFF SUKHJINDER S.**
                                          **BASRA'S MOTION FOR A**
24 MATTHEW CATE, Secretary of the California  **PRELIMINARY INJUNCTION**
   Department of Corrections and Rehabilitation, in
25 his official capacity, and TERRI GONZALEZ,  Honorable Stephen V. Wilson
   Warden of the California Men's Colony, in her
26 official and individual capacities,       Hearing Date:    March 28, 2011
                                             Time:            1:30 p.m.
27                 Defendants.               Courtroom:       6

28                                          Complaint Filed: February 25, 2011

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................1

II.   FACTUAL BACKGROUND ..............................................................................2

    A.    Basra's Sikh Faith ..................................................................................2

    B.    Basra's Incarceration .............................................................................2

    C.    Defendants Punish Basra on the Basis of His Religious Beliefs ...........3

III.  ARGUMENT ......................................................................................................6

    A.    Legal Standard .......................................................................................6

        1.    Standard for Issuing a Preliminary Injunction ...........................6

        2.    RLUIPA Prescribes Strict Scrutiny ............................................6

    B.    Basra is Likely to Prevail on the Merits Because the Grooming Policy
        Burdens his Practice of Religion and is not the Least Restrictive Means
        of Achieving a Compelling Interest. .......................................................8

        1.    The Grooming Policy Imposes a Substantial Burden on Basra's
            Religious Practice. .......................................................................8

        2.    Defendants Cannot Establish that the Beard Length Requirement
            is the Least Restrictive Means of Furthering a Compelling State
            Interest .........................................................................................9

            a.    Security Concerns Do Not Justify the Grooming Policy's
                Beard Length Restrictions When a Minimum Security
                Inmate is Involved. ..........................................................9

    C.    Failure to Grant an Injunction will Result in Irreparable Injury to Basra .........17

    D.    The Balance of Equities Sharply Favors Basra Because Defendants Are
        Not Unfairly Burdened by Returning to the Status Quo ...................................19

    E.    No Bond is Required Because There is No Likelihood of Harm to
        Defendants ............................................................................................20

IV.   CONCLUSION .................................................................................................21

i

# TABLE OF AUTHORITIES

Page(s)

**FEDERAL CASES**

*Alliance for Wild Rockies v. Cottrell*
    622 F.3d 1045 (9th Cir. 2010) ................................................................ 6

*American-Arab Anti-Discrimination Committee v. Reno*
    70 F.3d 1045 (9th Cir. 1995) ................................................................ 13

*Barahona-Gomez v. Reno*
    167 F.3d 1228 (9th Cir. 1999) ............................................................... 20

*Bhatia v. Chevron U.S.A., Inc.*
    734 F.2d 1382 (9th Cir. 1984) ................................................................. 8

*Chalk v. United States Dist. Court Cent. Dist. of Cal.*
    840 F.2d 701 (9th Cir. 1988) ................................................................. 18

*Church of Scientology v. United States*
    920 F.2d 1481 (9th Cir. 1990) ............................................................... 18

*Clear Channel Outdoor, Inc. v. City of Los Angeles*
    340 F.3d 810 (9th Cir. 2003) ................................................................... 6

*Cutter v. Wilkinson*
    544 U.S. 709 (2005) .............................................................................. 7

*Guru Nanak Sikh Soc'y v. County of Sutter*
    326 F.Supp.2d 1140 (E.D. Cal. 2003) .................................................. 18

*Henderson v. Terhune*
    379 F.3d 709 (9th Cir. 2004) ................................................................... 9

*Jorgensen v. Cassiday*
    320 F.3d 906 (9th Cir. 2003) ................................................................ 20

*Khalsa v. Weinberger*
    759 F.2d 1411 (9th Cir. 1985) ................................................................. 8

*Mayweathers v. Newland*
    314 F.3d 1062 (9th Cir. 2002) ......................................................... 7, 18

*Mayweathers v. Terhune*
    328 F.Supp.2d 1086 (E.D. Cal. 2004) .................................................. 11

*Murphy v. Zoning Comm'n of the Town of New Milford*
    148 F. Supp. 2d 173 (D. Conn. 2001) ............................................. 18, 19

ii

*Powe v. Ennis*
    177 F.3d 393 (5th Cir. 1999) ............................................................................ 4

*Richmond v. J.A. Croson Co.*
    488 U.S. 469 (1989) ............................................................................ 12, 13

*Warsoldier v. Woodford*
    418 F.3d 989 (9th Cir. 2005) .......................................................... passim

*Winter v. Natural Relations Defense Council*
    129 S.Ct. 365 (2008) ............................................................................ 6

*Wygant v. Jackson Bd. of Educ.*
    476 U.S. 267 (1986) ............................................................................ 13

**FEDERAL STATUTES**

Federal Bureau of Prisons, Program Statement 5230.05 § 551.4 ...................... 16

Federal Rules of Civil Procedure 65(c) ............................................................ 20

42 U.S.C. § 2000cc-1(a) ............................................................................ 7, 9

42 U.S.C. § 2000cc *et seq.* (2000) ............................................................ 1

**CALIFORNIA STATUTES**

California Code of Regulations, Title 15 CCR § 3000 .............................. 18

California Code of Regulations, Title 15 CCR § 3062(e) ................ 9, 12, 15

California Code of Regulations, Title 15 § 3062(h) .................. 1, 9, 12, 15, 21

California Code of Regulations, Title 15, § 3062(m) .............................. 17

California Code of Regulations, Title 15, § 3084.6(b)(4) ...................... 4

**OTHER AUTHORITIES**

146 Cong. Rec. S7774 (2000) ............................................................ 7

Administrative Regulation, Colorado Department of Corrections, Regulation Number
    850-11(IV)(A)(1)(d) ............................................................ 16

Nevada Administrative Regulation 705.01(1)(A) .............................. 16

Oregon Administrative Rules, § 291-123-0015(2)(a) ...................... 16

32413786 1.DOC

## I.   **INTRODUCTION**

Plaintiff Sukhjinder S. Basra ("Basra") is an inmate at the California Men's Colony Correctional Facility in San Luis Obispo, California (the "CMC"). Basra has practiced the Sikh faith his entire life and adheres to the religious practices and tenets of Sikhism. A fundamental requirement of the Sikh religion is that practitioners maintain unshorn hair (Kesh or Kes) on their body, a requirement that includes facial hair. This mandatory article of faith signifies respect for the will of God. In accordance with his sincerely held religious beliefs, Basra has always maintained his hair and beard uncut and unshaved, including during his incarceration at CMC, and Pleasant Valley State Prison ("PVSP") the California Department of Corrections and Rehabilitation ("CDCR") facility where he was housed prior to being transferred to CMC.

Basra's refusal to cut his beard has placed him at odds with Title 15 § 3062(h) of the California Code of Regulations ("CCR") ("Grooming Policy"), which requires all male inmates to keep their beards no longer than one-half inch. As a result of Basra's adherence to his deeply held religious beliefs, he has suffered repeated and ongoing disciplinary sanctions, including forty hours of extra work duty, ten days of confinement to quarters, and the loss of thirty days of good time credits. Basra pursued all available administrative remedies, but those efforts were unavailing, and Defendants continue to punish him for complying with his religious beliefs.

It was precisely to remove such unnecessary burdens on the practice of religion that Congress enacted the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.* (2000). Under RLUIPA, a regulation like the Grooming Policy that substantially burdens an inmate's practice of religion may be enforced only if it is the least restrictive means of achieving a compelling government interest. Because Defendants will not be able to carry their burden under this strict scrutiny test, and because Basra continues to suffer irreparable injury as a result of Defendants' unlawful application of the Grooming Policy, Basra is entitled to a preliminary injunction enjoining Defendants from punishing him for the exercise of his religious beliefs.

## II.   FACTUAL BACKGROUND

### A.   Basra's Sikh Faith

Basra is an inmate currently incarcerated at the CMC, a CDCR prison. (Declaration of Sukhjinder S. Basra in Support of Application for Preliminary Injunction ("Basra Decl."), ¶ 1.)  He has practiced the Sikh faith his entire life and has always maintained his hair and beard uncut and unshaved pursuant to his sincerely held religious beliefs. (Basra Decl., ¶ 4.) A fundamental requirement of the Sikh religion is that practitioners maintain unshorn hair (Kesh) on their body, a requirement that includes facial hair. This mandatory article of faith signifies respect for the will of God.  It is forbidden for Sikhs to cut their hair without violating the requirements of their religion.   Historically, some followers of Sikhism have been willing to be punished by death rather than cut their hair or shave. (Basra Decl., ¶¶ 4-5; *see also*, Declaration of Professor Gurinder Singh Mann In Support of Plaintiff's Motion for a Preliminary Injunction ("Mann Decl.") ¶ 7).

Because Basra is a Sikh, he believes that cutting his hair or beard is a grave violation of his Sikh religious beliefs.  He also has numerous male family members who similarly practice Sikhism, including the requirement of keeping Kesh by not shaving their beards or cutting their hair. (Basra Decl., ¶¶ 4-5; Mann Decl., ¶ 7.)

### B.   Basra's Incarceration

CMC officials have advised Basra that his uncut beard violates the CDCR Grooming Policy, which prohibits facial hair longer than one-half inch. As a consequence Basra has faced disciplinary sanctions and exclusion from prison programs and activities, including forty hours of extra work duty, ten days confinement to quarters with no bedside visitors, and the loss of thirty days of good time credits because he has adhered to his religious beliefs. The maintenance of an uncut and unshaved beard is so central to Basra's religious beliefs that he has endured the deprivation of privileges and become subject to longer confinement in prison rather than comply with the Grooming Policy. (Basra Decl., ¶ 6.)

Basra was originally held at the PVSP. On February 26, 2010, the CDCR transferred Basra to the CMC after he had spent one year at PVSP without any rules violations or

2

discipline. At the CMC, Basra is housed in an unlocked, ninety-person dormitory room, and has more extensive privileges than when he was held in PVSP. For example, has substantially more yard time than he did at PVSP and does not live in a locked two-man jail cell, as he did at PVSP. (Basra Decl., ¶ 7.)

Under CMC guidelines, Basra's ability to retain his privileges at the CMC, and avoid more restrictive confinement, depends largely upon his continued good behavior and lack of CDCR discipline. Each time that Basra is disciplined, for any reason, he receives a number of "points." Once the total points reach a certain number, Basra's status will change, and he may be transferred out of his current minimum security CMC assignment. (Basra Decl., ¶ 8.)

While Basra was incarcerated at the more restrictive PVSP, and during his initial confinement at CMC, the CDCR never warned Basra that his uncut beard violated the Grooming Policy or any other policy. He similarly was never disciplined while incarcerated at PVSP for having his beard longer than one-half inch, even though he was housed in a higher security setting at PVSP than at CMC. (Basra Decl., ¶ 9.)

When Basra first entered the state system through the inmate reception center, he was asked to run his fingers through his beard in front of guards. Since then, however, no CMC employee has ever searched Basra's beard or asked him to run his fingers through his beard. Nor has he ever been accused of hiding any contraband in his beard. Even when the prison guards performed periodic dormitory-wide searches on all inmates, including body searches and inspections, no guard has ever felt it necessary to physically manipulate Basra's beard, run a metal detection wand over it, or ask him to part his beard or run his fingers through it, for any reason. (Basra Decl., ¶ 10.)

## C.   Defendants Punish Basra on the Basis of His Religious Beliefs

Beginning in March 2010, after transferring Basra to CMC, the CDCR began to persecute him for retaining his unshaven and uncut beard. Since that time, Defendants have subjected Basra to punishment, including the loss of privileges and several disciplinary

3

1 | proceedings, as a direct consequence of their enforcement of the Grooming Policy.  (Basra
2 | Decl., ¶ 11.)

3 |      On April 3, April 30, and June 28, 2010, Basra received Rules Violation Reports
4 | ("RVR") for violating the Grooming Policy by maintaining "Facial Hair Longer Than 1/2
5 | inch," an Administrative Offense.  (Basra Decl., ¶¶ 12-14.)  In each of the three charges, a
6 | Reporting Employee ("RE") Correctional Officer stated that he had observed Basra violating
7 | the Grooming Policy by maintaining his beard longer than one-half inch.  Basra appeared at the
8 | hearing for each alleged Grooming Policy violation and explained that he grew his beard long
9 | because of his religious beliefs and that the policy infringed on these beliefs.   (*Id.*)
10 | Nevertheless, Basra was found "Guilty" of each of the three charges, and received various
11 | punishments, including over forty hours of extra duty, loss of his good time credits, and ten
12 | days confinement to quarters.[1]  (*Id.*)

13 |      Basra appealed each of the charges, and the disciplinary actions taken against him, on
14 | the basis that they violated his religious beliefs.  He then pursued these appeals through all three
15 | levels of administrative review.  (Basra Decl., ¶¶ 12-14.)  On July 19, 2010, the Inmate
16 | Appeals Branch informed Basra that he had exhausted his administrative remedies as to the
17 | April 3, 2010 RVR.  (Basra Decl., ¶ 12.)  On July 19, 2010, the Inmate Appeals Branch
18 | informed him that he had similarly exhausted his administrative remedies as to the April 30,
19 | 2010 RVR.  (Basra Decl., ¶ 13.)  Finally, as to the June 28, 2010 RVR, more than sixty (60)
20 | working days have passed since the CDCR Appeals Chief received Basra's third level
21 | appeal, which constructively exhausts his administrative remedies.[2]  (Basra Decl., ¶ 14.);
22 | Cal. Code. Reg. Tit. 15, § 3084.6(b)(4) ("Third level responses shall be completed within 60
23 | working days."); *see also*, *Powe v. Ennis*, 177 F.3d 393, 394 (5th Cir. 1999) ("A prisoner's
24 |
25 |

---

26 | [1] Confinement to quarters means that Basra must stay in his bunk and can only leave to eat, use the rest room, and for medical attention.  He also lost his rights to visitation, phone calls,
27 | yard access, day room, canteen, quarterly packages and accrual of excused time off.  (Basra Decl., ¶ 14 n. 1.)
28 | [2] Only the second level appeal decision is available, although more than 60 working days have passed since Basra filed his third level appeal of the June 28, 2010 RVR.

1  administrative remedies are deemed exhausted when a valid grievance has been filed and the

2  state's time for responding thereto has expired.").

3        Despite his numerous appeals, Basra was forced to serve and complete all of the

4  prescribed punishments for the three alleged "offenses." After completing these punishments,

5  Basra's good time credits (previously removed by Defendants as a punishment for his third

6  offense) were restored. (Basra Decl., ¶¶ 14-15.) Nonetheless, the offense and punishment

7  records continue to blot Basra's otherwise exemplary prison record.  If not for being

8  disciplined for his religious beliefs, Basra would have a model record in prison and would be

9  entitled to all of the benefits granted to prisoners at his security level. (Basra Decl., ¶ 16.)

10       On July 19, 2010, Basra submitted to Defendant Gonzalez a request for exemption

11  (the "Exemption Request"), asking for permission to leave his beard uncut in accordance

12  with his religious beliefs, and to avoid further discipline. In a letter dated July 28, 2010, the

13  CDCR denied this request, stating, in pertinent part:

14            For clarification, you are not being discriminated against, as

15            you allude to in your letter…You are being treated the same

16            as the other inmates at CMC.

17            You may have a beard, but you must keep it trimmed to no

18            more than one-half inch in length.  There is no provision in

19            the CCR, Title 15 for the Warden to exempt the grooming

20            standards.

21  (Basra Decl., ¶ 17.)  As a result of the Grooming Policy, Basra has suffered and likely will

22  continue to suffer disciplinary sanctions, including but not limited to the following: (1) loss

23  of visitation rights; (2) extra duties; (3) loss of assignment to particular duties; (4); extra

24  restrictions or confinement and (5) loss of Work Time Credit or risk of loss of credits in the

25  future. (Basra Decl., ¶ 18.) Accordingly, Defendants' severe, harmful restriction on Basra's

26  basic religious exercise is ongoing, and a preliminary injunction is both warranted and

27  necessary.

28

III.   **ARGUMENT**

A.   **Legal Standard**

1.   **Standard for Issuing a Preliminary Injunction**

The Supreme Court has determined that "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Relations Defense Council*, 129 S.Ct. 365, 374 (2008).

Prior to the *Winter* decision, the Ninth Circuit had adopted a sliding scale approach, where a stronger showing of one element in the preliminary injunction test could offset a weaker showing of another. *See, e.g.*, *Clear Channel Outdoor, Inc. v. City of Los Angeles*, 340 F.3d 810, 813 (9th Cir. 2003). One version of this sliding scale, embraced by the Ninth Circuit, was the "serious questions" approach: "a preliminary injunction could issue where the likelihood of success is such that serious questions going to the merits were raised and the balance of hardships tips sharply in plaintiff's favor." *Alliance for Wild Rockies v. Cottrell*, 622 F.3d 1045, 1049 (9th Cir. 2010). In *Alliance for Wild Rockies*, the Ninth Circuit concluded that the "'serious questions' version of the sliding scale test for preliminary injunctions remains viable after the Supreme Court's decision in *Winter*" so long as the plaintiff can also show that the balance of hardships tips sharply in his favor. *Id.* at 1052.

Thus, the current "sliding scale" test requires issuance of a preliminary injunction if Basra satisfies the test set forth in *Winter* or if he raises "serious questions" going to the merits of his claim, and the balance of hardships tips sharply in his favor. *Cottrell*, 622 F.3d at 1049. Basra's circumstances meet these standards.

2.   **RLUIPA Prescribes Strict Scrutiny**

The requirements of RLUIPA are directly relevant to Basra's likelihood of success on the merits of his case. RLUIPA, in pertinent part, provides:

///

///

6

32413786 1.DOC

(a)    General Rule

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 of this title, even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on the person-

(1) is in furtherance of a compelling government interest; and

(2) is the least restrictive means of furthering that compelling government interest.

42 U.S.C. § 2000cc-1(a).[3]  Under RLUIPA, Basra "bears the initial burden of going forward with evidence to demonstrate a prima facie claim that [the] grooming policy and its punitive sanctions designed to coerce him to comply with that policy constitute a substantial burden on the exercise of his religious beliefs." *Warsoldier v. Woodford*, 418 F.3d 989, 995 (9th Cir. 2005).   Once Basra establishes the prima facie existence of a substantial burden, Defendants must prove that their policy is both in furtherance of a compelling governmental interest and the least restrictive means of furthering that interest.[4]  *Id.*

///

///

---

[3] The Supreme Court and the Ninth Circuit have rejected a variety of challenges to RLUIPA's constitutionality.   *See Cutter v. Wilkinson*, 544 U.S. 709 (2005) (holding RLUIPA's provisions governing institutionalized persons do not violate the Establishment Clause); *Mayweathers v. Newland*, 314 F.3d 1062 (9th Cir. 2002) (holding that RLUIPA was within Congress' Spending Clause powers and finding no other independent constitutional proscription).

[4] Congress' expressed intent to remove unnecessary barriers blocking prison inmates from practicing their religion is evident not only from the plain text of the statute, but also from the legislative history.   For example, the Congressional Record explains that "[i]nstitutionalized residents' rights to practice their faith is at the mercy of those running the institution, and their experience is very mixed . . . .   [P]rison officials sometimes impose frivolous or arbitrary rules.   Whether from indifference, ignorance, bigotry, or lack of resources, some institutions restrict religious liberty in egregious and unnecessary ways." 146 Cong. Rec. S7774, at S7775 (2000) (enacted).

7

**B.**   **Basra is Likely to Prevail on the Merits Because the Grooming Policy Burdens his Practice of Religion and is not the Least Restrictive Means of Achieving a Compelling Interest.**

       **1.**   **The Grooming Policy Imposes a Substantial Burden on Basra's Religious Practice.**

As an initial matter, Basra must show that Defendants have substantially burdened his religious exercise.   Basra has practiced Sikhism throughout his entire life, including his lifelong adherence to the Sikh practice of leaving his beard and hair unshaved and uncut. (Basra Decl., ¶ 4.)   In fact, a fundamental requirement of the Sikh religion is that practitioners maintain unshorn hair (Kesh) on their body, a requirement that includes facial hair.   (Basra Decl., ¶ 4; Mann Decl. ¶¶ 3, 7.)   As a Sikh, Basra believes that violating the practice of keeping Kesh by shaving or cutting his beard would be a breach of his religious obligations.   (Basra Decl., ¶ 5.)   Keeping unshorn hair, including facial hair, is recognized as a fundamental religious requirement in Sikhism.   *See Khalsa v. Weinberger*, 759 F.2d 1411, 1412 (9th Cir. 1985) ("Practicing Sikhs must wear unshorn head and facial hair[.]"); *Bhatia v. Chevron U.S.A., Inc.*, 734 F.2d 1382, 1383 (9th Cir. 1984) (Plaintiff "established a prima facie case of religious discrimination by proving that he had a bona fide belief that shaving his beard would be contrary to the Sikh religion."); *see also* Mann Decl. ¶¶ 3, 7.

By disciplining Mr. Basra for his refusal to cut his beard, Defendants have substantially burdened his religious exercise.   Indeed, the Ninth Circuit has already determined that, if a grooming policy "intentionally puts significant pressure on inmates…to abandon their religious beliefs by cutting their hair…[then it] imposes a substantial burden on [the inmate's] religious practice." *Warsoldier*, 418 F.3d at 996.   The *Warsoldier* decision is both binding authority, and directly analogous to Basra's claims.   Thus, the Grooming Policy, which pressures him to cut his hair by punishing him for failing to do so, is a substantial burden on his exercise of religion.

///

///

8

### 2.  **Defendants Cannot Establish that the Beard Length Requirement is the Least Restrictive Means of Furthering a Compelling State Interest**

Because Basra has met his burden under RLUIPA, Defendants must demonstrate that the beard-length requirement in CCR § 3062(h) furthers a compelling government interest and is the least restrictive means of furthering that interest.  42 U.S.C. § 2000cc-1(a). Defendants will be unable to meet that burden.  Traditionally, the justifications proffered by prison officials for policies like California's Grooming Policy have been rooted in alleged security concerns.  Specifically, the CDCR has justified the beard regulation based on its assumption that lengthy beards will assist the inmates in a possible escape and further, that the lengthy beards may be utilized by the inmates to hide weapons and other contraband. (Declaration of Toni V. Bair ("Bair Decl."), ¶ 10.); *see also, Henderson v. Terhune*, 379 F.3d 709, 712-13 (9th Cir. 2004); *Warsoldier*, 418 F.3d at 997.

However, the CDCR assumptions are without merit for two reasons: First, prisoners do not escape from prison or jails by growing or shaving long beards to alter their appearance; moreover, there are policies, procedures and systems already in place that make it extremely difficult for inmates to escape custody from a secure correctional facility, even if prisoners are permitted to have long beards.  Second, as an empirical matter, there is no real problem in prisons and jails of prisoners concealing contraband in long beards; moreover even if there were, the problem could be addressed without prohibiting long beards.  (Bair Decl., ¶ 11.)

### a.  **Security Concerns Do Not Justify the Grooming Policy's Beard Length Restrictions When a Minimum Security Inmate is Involved.**

Because Basra is a minimum security inmate, the CDCR's interest in security does not qualify as a "compelling state interest" sufficient to justify the Grooming Policy.  In fact, this same rationale was unsuccessfully advanced by the defendants in *Warsoldier*.  The *Warsoldier* decision focused on former 15 CCR § 3062(e), which limited hair length to 3

9

32413786 1.DOC

inches.  Mr. Warsoldier was a Native American inmate who kept his hair longer on account of his religious beliefs.  Like Basra, Mr. Warsoldier was disciplined by the CDCR for violations of the grooming policy.  *Warsoldier*, 418 F.3d at 992.

The *Warsoldier* defendants argued that the hair-length requirements advanced security because it decreased the risk of hidden contraband, and made it easier to identify escaped inmates.  *Warsoldier*, 418 F.3d at 995.  Despite these proffered rationales, the Ninth Circuit determined that the hair-length restriction was not the least restrictive means of furthering defendants' asserted penological interests.  *Id.* at 998-99.

Like Basra, Mr. Warsoldier was also a minimum security prisoner, which lessened the security risks involved with his incarceration.  The *Warsoldier* Court stated that minimum security inmates "have less serious criminal histories, are serving minimal sentences, and are less likely to attempt to escape." *Warsoldier*, 418 F.3d at 999.[5]

As in *Warsoldier*, Defendants cannot meet their burden to show that the beard length restrictions are justified by an interest in security.  Basra was reclassified as a minimum security inmate and transferred to CMC after a full year of discipline free incarceration in a more restrictive prison (PVSP).  (Basra Decl. ¶ 7.)  At CMC, he is housed in an unlocked, 90-person dormitory room and has substantially more freedom than he did at PVSP.  (*Id.*)  Accordingly, Defendants interest in security is insufficient to justify their stringent Grooming Policy, particularly as applied to Basra in this matter.

        **b.**    **The CDCR Does Not Have a Real Problem With Inmates Escaping By Growing and/or Shaving Long Beards**

Defendants cannot show that they have had any issues with minimum security inmates growing/shaving their beards in order to facilitate escape, or with inmates hiding contraband in long beards.  (*See* Bair Decl., ¶ 12.)  Thus, Defendants cannot use these

---

[5] Ironically, Basra had no issues with his beard length when at PVSP, a more restrictive facility, but has been repeatedly sanctioned at CMC as a minimum security inmate.  (Basra Decl., ¶¶ 9, 11.)

justifications to satisfy their burden to show that they have a compelling state interest in the Grooming Policy's beard length restrictions.

Basra's expert, Toni V. Bair, confirms that lengthy beards do not pose a problem to correction's primary mission of security, safety and humane treatment of inmates in their custody.  Mr. Bair has worked as a Corrections professional for more than thirty-five years, including in both jails and state prisons.  (Bair Decl., ¶ 3 & Exh 1.)  He also has extensive experience dealing with inmate escapes and the policies and procedures necessary to prevent them.   In 1985, he was hired to be the warden at Mecklenburg Correctional Facility in Virginia, shortly after six death row inmates had escaped, and he conducted a thorough review of the facility's policies and procedures to prevent future escapes. (Bair Decl., ¶ 6.)

Based on Bair's extensive expertise, he opines that inmates do not grow or shave long beard to facilitate escape.   (Bair Decl., ¶ 11.)   Similarly, plaintiff's expert witness in *Mayweathers v. Terhune*, 328 F.Supp.2d 1086, 1095 (E.D. Cal. 2004), George Sullivan, concurred that this is a non-issue.  He too had never heard of an inmate's escaping from a secure facility by shaving his beard or altering his appearance in such a way that professional correctional staff would allow him to walk out the front doors and escape. (*Mayweathers v. Terhune*, 328 F.Supp.2d at 1095; Bair Decl., ¶¶ 12-13.)  Defendants may point to anecdotal instances (although neither Mr. Bair nor George Sullivan has ever heard of one); however, they certainly will not rise to the level of frequency which would make a regulation prohibiting inmates from growing beards necessary. (Bair Decl., ¶ 13.)

As Mr. Bair states:

> Inmates may escape by going over, through or under security fences.  They may hide in a vehicle leaving the institution. They may effectuate an escape while escorted outside the perimeter for a medical, legal or work excursion.  Inmates do not escape through the front gate by altering their appearances for one simple reason: it doesn't work.  Consequently, they don't try it.

11

1   (Bair Decl., ¶¶ 14, 25.)  Moreover, according to the Bureau of Justice Statistics less than
2   one-half of one percent (½ of 1%) of incarcerated inmates actually escapes.  That miniscule
3   percentage is mainly comprised of inmates who *did not* escape from secure confinement.
4   (*See* Bair Decl., ¶ 15 (discussing the fact that most inmates "escape" from halfway houses,
5   work release programs, and while on excursions from secure facilities).)  In sum, inmates
6   cannot, and do not, alter their appearances and simply walk out the front gate of secure
7   facilities. (*Id.*)

8         **c.**   **Prisons Do Not Face Any Real Risks Associated With**
9               **Prisoners' Hiding Contraband in Long Beards.**

10      Similarly, Defendants' other proffered interest in preventing inmates from concealing
11   weapons and contraband in their beards is also baseless.  Mr. Bair has never heard of this
12   problem in his thirty-five years of experience in corrections.   (Bair Decl., ¶¶ 27-29.)
13   Moreover, even if concealing contraband in long beards was an issue, those same concerns
14   would be posed by prisoners' having long hair. (Bair Decl., ¶ 30.) However, CCR § 3062(e)
15   permits an inmate's hair to be "any length," and "if hair is long, it shall be shall be worn in a
16   neat, plain style, which does not draw undue attention to the inmate."  The incongruity
17   between Defendants' stringent beard restrictions, and the lack of any restrictions on an
18   inmate's head hair length began after the *Warsoldier* decision.  As a direct result of the
19   *Warsoldier* case, California revised its grooming policy to permit "any length" of hair.  CCR
20   § 3062(e).  However, California *did not* change CCR § 3062(h) following the decision in the
21   *Warsoldier* case, which is the section under which Basra was disciplined for his beard length.
22   By permitting prisoners to have long hair, Defendants undermine any claim they might have
23   that it is essential to safety and security for them to prevent prisoners from having long
24   beards.

25      Because Defendants will not be able to present any evidence of a widespread problem
26   with either prisoners' attempting to escape by shaving their beards to alter their appearance
27   or prisoners' concealing contraband in long beards, CDCR's beard length regulation cannot
28   survive strict scrutiny. In *Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989), the Supreme

32413786 1.DOC

1    Court found that the complete absence of an identified problem with discrimination against

2    Spanish-speaking, Oriental, Indian, Eskimo, or Aleut persons precluded a City's affirmative

3    action policy in favor of those groups, *id.* at 728, even though remedying past discrimination

4    is a compelling government interest. *See, e.g., Wygant v. Jackson Bd. of Educ.*, 476 U.S.

5    267, 274 (1986).   Similarly, in this case, it is not enough for Defendants to talk about

6    "security" and preventing escapes as compelling interests.  Instead, Defendants must show

7    that long beards threaten security by creating a true danger of escapes and/or contraband

8    concealment to meet their burden under strict scrutiny.  *See Croson*, 488 U.S. at 728; *cf.*

9    *American-Arab Anti-Discrimination Committee v. Reno*, 70 F.3d 1045, 1069-70 (9th Cir.

10   1995) (government cannot demonstrate strong interest in deporting two individuals on the

11   basis of secret evidence by claiming they are part of an organization that threatens national

12   security where it fails to show that either individual in any way threatens the national

13   security).  They will be unable to do so.

14              **d.      Even if There Were an Actual Risk that Prisoners Would Use**

15                       **Lengthy Beards to Escape or Conceal Contraband, There are**

16                       **Numerous Less Restrictive Alternatives.**

17         Prisons and jails throughout the United States already have systems set up to ensure

18   that inmates do not escape from secure confinement.  These systems should already be in

19   place in CDCR facilities.  If they are not, they are nonetheless available as alternatives that

20   are less restrictive to religious practice than a ban on long beards:

21      ▪ Identification Cards (ID): All individuals who enter a secure prison facility must show

22         a form of personal identification.  Once their identity is verified, they are issued a

23         prison access card and/or badge, which must be carried at all times.  As such, in

24         addition to altering his appearance, an inmate would have to obtain an altered ID in

25         order to have a chance of escaping. (Bair Decl., ¶ 17.)

26      ▪ Picture ID Check Points: An inmate is required to show his picture ID to corrections

27         officers in order to travel through the various check points in the prison.  If an inmate

28         alters his appearance, the corrections officers ensure that a new picture ID is issued.

13

1   If an inmate altered his appearance by shaving or growing a beard, he would still not
2   be able to exit the institution if his picture ID did not match his altered appearance.
3   (Bair Decl., ¶ 18.)

4   ■ Monthly Classification Hearings: An inmate's intake picture is included in his file,
5   which is reviewed during monthly classification hearings.  If his appearance has been
6   altered, including by growing or shaving his beard, the classification committee
7   orders a new picture for his file as well as a new ID card.  Accordingly, in the unlikely
8   event that an inmate escaped, his file would always contain a current picture of him.
9   (Bair Decl., ¶ 19.)

10  ■ Daily Inmate, Staff, Visitor Rosters:  If an inmate is scheduled to depart the prison
11  facility for any reason, that information is located on the daily inmate roster kept by
12  the corrections officers.  If an inmate altered his appearance in an escape attempt, he
13  would also need to alter the inmate roster, and obtain a corrections escort, in order to
14  exit the facility. (Bair Decl., ¶ 20.)

15  ■ Entry and Exit Points From Institutions:  As a general rule, all pedestrian egress from
16  a prison facility is through one front gate, and anyone leaving must show their picture
17  ID.  In his over twenty-five years of experience, Mr. Bair has never heard of an
18  inmate being able to escape through the front gate and deceive the security staff by
19  altering his appearance.  (Bair Decl., ¶ 21.)

20  ■ Inmate Escort:  All inmates who leave the facility are escorted by a member of the
21  correctional staff, and are almost always restrained with handcuffs and/or leg chains.
22  An inmate who shaved or grew his beard in an escape attempt would have to also find
23  a way to escape his corrections escort, and remove his restraints.  (Bair Decl., ¶ 22.)

24  Prisons do not just rely on facial recognition to determine who is allowed to enter or
25  exit the institution.  Instead, they rely on ID cards, badges, escorts, restraints and rosters.  As
26  such, altering one's appearance is not a method of escape for a professionally managed
27  prison. (Bair Decl., ¶ 23.)  In fact, even if an inmate shaved/grew a beard while in prison, he
28  would still have to overcome all of the other obstacles detailed above in order to actually

14

escape. "From a statistical standpoint, that is very difficult to do. Occasional escapes from secure confinement do occur; however, they do not occur by an inmate altering his appearance and then somehow walking out the front gate." (Bair Decl., ¶ 24.)

As to Defendants' concern about inmates hiding contraband in long beards, they could easily utilize the procedure that they already have in place for long head hair. As stated above, CCR § 3062(e) allows long hair as long as it is kept neat and does not draw attention to the inmate. There is no reason that whatever policies California uses to ensure that inmates do not conceal contraband in their long hair could not be instituted to govern inmates' beard length. (Bair Decl., ¶ 31.)

Moreover, Defendants cannot meet their burden to prove that the Grooming Policy is the least restrictive means unless they demonstrate that they actually considered the efficacy of other less restrictive measures. *See Warsoldier*, 418 F.3d at 999. As the Ninth Circuit noted in *Warsoldier*, one such measure would be to create a religious exemption to the Grooming Policy as other states have done.[6] *Id.* (noting that prisons in Oregon, Colorado and Nevada all either have no hair length requirements or allow for religious exemptions).

Based on the number of alternatives to address Defendants' security concerns, CDCR Regulation CCR §3062(h) cannot possibly constitute the least restrictive means to meet the governmental security objective of preventing escapes from secure confinement and contraband. (Bair Decl., ¶ 26.)

        **e.**    **Because the Majority of Other State Prison Systems and the Federal Bureau of Prisons Have No Beard Length Restriction, Defendants' Grooming Policy Cannot Possibly Constitute the Least Restrictive Alternative.**

---

[6] There is no evidence to show that Defendants considered allowing religious exemptions to their beard-length restriction. In fact, Basra requested such an exemption, but CDCR unilaterally denied the request. (Basra Decl., ¶ 17.) If the CDCR did not consider religious exemptions when drafting the beard-length restriction, it would foreclose any claim that it considered the efficacy of less restrictive alternatives.

15

1    Any effort to characterize the Grooming Policy as the least restrictive means of
2    achieving a compelling interest will be fatally undermined by the practices of the Federal
3    Bureau of Prisons ("FBOP") and other state prison systems.  All these prison systems share
4    California's concerns about preventing escape and ensuring security but many of them have
5    adopted grooming policies more accommodating of religious practice.  In fact, the *majority*
6    of state prison systems and the FBOP do not prohibit inmates from having long beards.
7    (Bair Decl., ¶ 32.)  Consequently, the California regulation stands in stark contrast to current
8    United States correctional standards.  (Bair Decl., ¶¶ 33-39.)

9    For example, Oregon's only requirement is that "[h]ead and facial hair must be
10   maintained in a clean and neat manner."   Oregon Administrative Rules, § 291-123-
11   0015(2)(a).  Nevada allows "freedom in personal grooming," including "sideburns, beards
12   and moustaches, provided they are kept clean and neat."  Nevada Administrative Regulation
13   705.01(1)(A).  The FBOP specifically states that "[t]he Warden may not restrict hair length if
14   the inmate keeps it neat and clean."  U.S. Department of Justice, Federal Bureau of Prisons,
15   Program Statement 5230.05 § 551.4.   The Colorado Department of Corrections does have a
16   beard and hair length requirement, but also provides an exemption to its grooming rules to
17   accommodate inmates' sincerely held religious beliefs.  *See* Administrative Regulation,
18   Colorado Department of Corrections, Regulation Number 850-11(IV)(A)(1)(d) ("An
19   offender who claims that long hair and/or a beard is a fundamental tenet of a sincerely held
20   religious belief will not be required to have a hair cut as long as the offender obtains
21   documentation from the Community Resources coordinator.").

22   That other states and the federal government either impose no beard length restriction
23   or accommodate inmates' sincerely held religious beliefs is itself sufficient evidence that
24   Defendants will be unable to meet their burden under strict scrutiny.  (Bair Decl., ¶¶ 40-41.);
25   *Warsoldier*, 418 F.3d at 1000.   These other prison systems have the same compelling
26   interests in maintaining prison security as Defendants.  If "these prison systems are able to
27   meet their indistinguishable interests without infringing on their inmates' right to freely
28   exercise their religious beliefs," then Defendants should be able to as well. *Id.* As the Ninth

16

1   Circuit noted in *Warsoldier*, these considerations are relevant to a determination of whether

2   Defendants' policy represents the least restrictive alternative:

3           [W]e have found comparisons between institutions

4           analytically useful when considering whether the government

5           is employing the least restrictive means. Indeed, the failure of

6           a defendant to explain why another institution with the same

7           compelling interests was able to accommodate the same

8           religious practices may constitute a failure to establish that the

9           defendant was using the least restrictive means.

10  *Warsoldier*, 418 F.3d at 1000 (internal citations omitted). In sum, Defendants' burden of

11  demonstrating that the Grooming Policy, as applied to Basra, is the least restrictive means of

12  achieving any compelling government interest is nearly insurmountable. Accordingly, Basra

13  is likely to prevail on the merits of his RLUIPA claim.

14          **C.**    **Failure to Grant an Injunction will Result in Irreparable Injury to Basra**

15          Defendants have repeatedly subjected Basra to disciplinary sanctions, and he is at risk

16  that they will continue to do so under their Grooming Policy, as a consequence of his

17  religious exercise. He has been repeatedly punished due to his refusal to cut his beard,

18  including performing more than forty hours of extra duty, loss of his good time credits and ten

19  days confinement to quarters. (Basra Decl., ¶ 18.) Because Defendants have denied Basra's

20  request for a religious exemption, he continues to be in violation of the Grooming Policy.

21  Basra's continuing "violation" of the beard-length requirements, and his prior RVRs, place

22  him in immediate danger of being deemed a "program failure." 15 CCP § 3062(m). A

23  "program failure" is defined as:

24          [A]ny inmate who generates a significant disciplinary history

25          within the last 180 days from the current date. A guilty

26          finding for two serious Rules Violation Reports or one serious

27          and two administrative Rules Violation Reports within that

28

17

1    180 day time period is reasonable evidence of a significant

2    disciplinary history and may be considered a program failure.

3    15 CCR § 3000.   Basra has already received a referral to program review to

4    determine whether he should be deemed a "program failure."   (Basra Decl., ¶ 14.)

5    　　　　Even if Basra were to prevail in this litigation and secure permanent injunctive relief

6    at some later date, he would receive no recompense for the deprivations he has suffered and

7    continues to suffer as a result of Defendants' disciplinary sanctions.   Such injuries plainly

8    constitute irreparable injury under the law of this circuit.   *See, e.g., Chalk v. United States*

9    *Dist. Court Cent. Dist. of Cal.*, 840 F.2d 701, 709 (9th Cir. 1988) (holding that "emotional

10   stress, depression and reduced sense of well-being" from loss of employment constitute

11   irreparable injury); *Mayweathers,* 258 F.3d at 938 (holding that "inmates suffer irreparable

12   harm when they are unable to attend religious services . . . ."); *see also, Murphy v. Zoning*

13   *Comm'n of the Town of New Milford*, 148 F. Supp. 2d 173, 180 (D. Conn. 2001)

14   ("Irreparable harm means that type of injury for which a monetary award would fail to be

15   adequate compensation.").

16   　　　　While Basra is not being physically prevented from exercising his religious beliefs, in

17   that he has not been forced to cut his beard, he is being punished for adhering to them.   This

18   kind of "chilling effect" on the constitutional right to freedom of religion constitutes

19   irreparable injury.   *See Murphy*, 148 F. Supp. 2d. at 181 (holding that a chilling effect on the

20   right to associate and the right to freedom of religion was more than enough to satisfy the

21   irreparable harm requirement).   The "loss of First Amendment freedoms, for even minimal

22   periods of time, unquestionably constitutes irreparable injury." *Church of Scientology v.*

23   *United States*, 920 F.2d 1481, 1488 (9th Cir. 1990) (*quoting Elrod v. Burns*, 427 U.S. 347

24   (1976)); *Guru Nanak Sikh Soc'y v. County of Sutter*, 326 F.Supp.2d 1140, 1161 (E.D. Cal.

25   2003).   Furthermore, Congress enacted RLUIPA to "protect the free exercise of religion

26   from unnecessary government interference." *Murphy*, 148 F.Supp.2d at 180 (citation

27   omitted).   Congress' expressed intent to protect the free exercise of religion led the court in

28   *Murphy* to conclude the following:

> Since the statute ["RLUIPA"] was enacted for the express purpose of protecting the First Amendment rights of individuals, the allegation that defendants have violated this statute also triggers the same concerns that led the courts to hold that these violations result in a presumption of irreparable harm.

*Murphy*, 148 F.Supp.2d at 180-181. Thus, at the very least, in a RLUIPA context the actual loss of the ability to exercise religious beliefs is not necessary to find that a prisoner faces a threat of irreparable injury in the absence of a preliminary injunction. Rather, where a prisoner is forced to choose between being punished for adhering to his religious beliefs or rejecting his religious beliefs to avoid punishment, he is threatened with the loss of his right to religious freedom, which constitutes irreparable injury as a matter of law. *See supra* note 4; *see also, Warsoldier*, 418 F.3d at 1001 ("Because Warsoldier has, at a minimum, raised a colorable claim that the exercise of his religious beliefs has been infringed, he has sufficiently established that he will suffer an irreparable injury absent an injunction barring enforcement of the grooming policy against him. We have previously held that putting substantial pressure on an adherent to modify his behavior and to violation his belief' infringes on the free exercise of religion."). Therefore, a preliminary injunction is necessary to ensure that Basra is not threatened with irreparable injury.

**D.   The Balance of Equities Sharply Favors Basra Because Defendants Are Not Unfairly Burdened by Returning to the Status Quo**

Each day that Basra is punished for adhering to his religious beliefs, he is irreparably injured. Enjoining Defendants from punishing Basra for non-compliance with the Grooming Policy does not unfairly burden Defendants. To the contrary, there is no evidence that Defendants will face any burden whatsoever if Basra returns to his previous activities within the CMC. Basra's status as a minimum security inmate and his lack of any prior disciplinary actions attest to the fact that he poses no special security threat. (Basra Decl. ¶ 16.)

1        As discussed above, the Ninth Circuit recognizes that minimum security inmates have

2  less serious criminal histories and are less likely to escape. *See Warsoldier*, 418 F.3d at 999.

3  This fact mitigates any security concerns that Defendants may have. Indeed, it would be

4  anomalous for Defendants to argue that Basra poses some sort of elevated security threat,

5  while they have chosen to house him in a less-restrictive, minimum security setting. (*See*

6  Basra Decl. ¶ 7.)

7        Moreover, Basra spent a year at PVSP, a higher security prison, and was never

8  disciplined for any reason. (Basra ¶¶ 7, 9.) After Basra was transferred to CMC, he

9  similarly participated in correctional center activities for over a month before he received his

10  first Rules Violation Report. (Basra Decl., ¶¶ 7, 11.) Defendants have also never felt the

11  need to Basra's beard, or ask him to run his fingers through it while at either institution

12  (other than his initial intake when he first entered the state system). Basra Decl. ¶ 10.

13        Defendants did not cite Basra during his incarceration at PVSP, or during his initial

14  time at CMC. Nor did Defendants even search Mr. Basra's beard at any time while he was at

15  PVSP or CMC. This uneven enforcement of the Grooming Policy demonstrates that

16  Defendants will suffer no appreciable hardship if they cannot punish Basra while the case

17  proceeds to final judgment. Thus, there is no evidence that granting the instant preliminary

18  injunction will impose any burden on Defendants.

19      **E.**    **No Bond is Required Because There is No Likelihood of Harm to**

20            **Defendants**

21        The Court should not require Basra to post a bond. Under Federal Rules of Civil

22  Procedure 65(c), this Court has the discretion to set the amount of security, if any. *See*

23  *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999) (citations omitted).

24  However, "the district court may dispense with the filing of a bond when it concludes there

25  is no likelihood of harm to the defendant from enjoining his or her conduct." *Jorgensen v.*

26  *Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (affirming no imposition of bond when it is

27  unlikely that an injunction will cause harm). Waiver of a bond is particularly appropriate

28  where public interest groups seek to enforce rights in matters of public interest. *Id.*

32413786 1.DOC

1        Enjoining Defendants punishing Basra due to his beard-length will not result in any

2    harm to Defendants.  Therefore, the Court should dispense with the requirement of a bond.

3    **IV.**     **CONCLUSION**

4        Plaintiff Sukhjinder S. Basra respectfully requests that this Court issue a preliminary

5    injunction enjoining Defendants from enforcing or threatening to enforce  § 3062(h) of the

6    California Code of Regulations, and otherwise interfering in any other manner with his

7    maintaining his beard uncut.

8    DATED: March 3, 2011                    Respectfully submitted,

9                                                       JONATHAN M. GORDON
                                                        LEIB M. LERNER
10                                                      CASSANDRA E. HOOKS
                                                        **ALSTON & BIRD LLP**
11

12                                                      _/s/  Cassandra E. Hooks_
                                                        Cassandra E. Hooks
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

32413786 1.DOC

1

## PROOF OF SERVICE

2

I, Lisa Reynolds, declare:

3

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is Alston & Bird LLP, 333 South Hope Street, Sixteenth Floor, Los Angeles, California, 90071. I am over the age of eighteen years and not a party to the action in which this service is made.

4

5

6

On March 3, 2011, I served the document(s) described as **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF SUKHJINDER S. BASRA'S MOTION FOR A PRELIMINARY INJUNCTION** on the interested parties in this action by enclosing the document(s) in a sealed envelope addressed as follows:  SEE ATTACHED SERVICE LIST

7

8

9

☒   BY MAIL:  I am "readily familiar" with this firm's practice for the collection and the processing of correspondence for mailing with the United States Postal Service.  In the ordinary course of business, the correspondence would be deposited with the United States Postal Service at 333 South Hope Street, Los Angeles, California 90071 with postage thereon fully prepaid the same day on which the correspondence was placed for collection and mailing at the firm. Following ordinary business practices, I placed for collection and mailing with the United States Postal Service such envelope at Alston & Bird LLP, 333 South Hope Street, Los Angeles, California 90071.

10

11

12

13

14

☐   UPS NEXT DAY AIR:  I deposited such envelope in a facility regularly maintained by UPS with delivery fees fully provided for or delivered the envelope to a courier or driver of UPS authorized to receive documents at Alston & Bird LLP, 333 South Hope Street, Los Angeles, California 90071 with delivery fees fully provided for.

15

16

17

☐   BY FACSIMILE:  I telecopied a copy of said document(s) to the following addressee(s) at the following number(s) in accordance with the written confirmation of counsel in this action.

18

19

☐   BY E-MAIL: I submitted an electronic version of this document and exhibits, if any, via PDF to all parties at their e-mail addresses on the attached Service List.

20

☐   [State]      I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

21

22

☒   [Federal]      I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

23

24

Executed on March 3, 2011, at Los Angeles, California.

25

26

Lisa Reynolds

27

28

32413786 1.DOC

*SUKHJINDER S. BASRA v. MATTHEW CATE, ET AL*
**USDC Case No. CV11-01676 SVW (FMOx)**


**Service List**


Matthew Cate                                    Defendant
c/o Legal Office
1515 "S" Street
Room 314-S
Sacramento, CA 95811


Warden Terri Gonzalez                           Defendant
c/o Andrew Pitoniak
Litigation Coordinator
Men's Colony
Highway 1
San Luis Obispo, CA 93409

32413786 1.DOC